**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| BETH ANN BADIA, | ) | CASE NO. 5:12-cv-1321 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE VECCHIARELLI |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | MEMORANDUM OPINION |
| | ) | |
| Defendant. | ) | |

This case is before the magistrate judge by consent of the parties.  Plaintiff, Beth

Ann Badia ("Badia"), challenges the final decision of the Commissioner of Social Security

("Commissioner"), denying Badia's application for  Supplemental Security Income ("SSI")

under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1382(c), and a period of

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§

416(i).  This court has jurisdiction pursuant to 42 U.S.C. § 405(g).

For the reasons set forth below, the opinion of the Commissioner is AFFIRMED.

I.  Procedural History

Badia filed an application for SSI and DIB on October 22, 2008, alleging mental

disability as of September 10, 2008 due to a stroke or seizure, impairments in her

extremities, and lower back pain.  Badia's application was denied initially and upon

reconsideration.  She timely requested an administrative hearing.

Administrative Law Judge Julie Terry ("ALJ") held a hearing on March 30, 2011. Badia, represented by counsel, testified on her own behalf.  Barbara Burk testified as a vocational expert ("VE").  The ALJ issued a decision on April 7, 2011 in which she determined that Badia was not disabled within the meaning of the Act.  Badia requested review of the ALJ's decision by the Appeals Council.  When the Appeals Council declined further review on April 25, 2012, the ALJ's decision became the final decision of the Commissioner.

Badia filed an appeal to this court on May 25, 2012.  Badia alleges that the ALJ erred because (1) the ALJ did not properly consider Badia's subjective statements and (2) the ALJ failed to call a medical expert at the hearing.  The Commissioner denies that the ALJ erred.

## II.  Evidence

### A.    *Personal and Vocational Evidence*

Badia was born on June 21, 1958 and was 50 years old on her alleged onset date of January 21, 2008.  Badia has a high school degree and past relevant work as a sash builder.  She was insured through December 31, 2010.

### B.    *Medical Evidence*

Badia suffered a small right internal capsule intracerebral hemorrhage on October 31, 2006, exhibited by a sudden headache and garbled speech.  Transcript ("Tr."), pp. 363, 373, 382.   She reported to the Ohio State University Medical Center in Columbus, Ohio ("the Medical Center"), where a CT scan of Badia's head reached findings consistent with an intraparenchymal hemorrhage with associated edema in the right posterior limb of the internal capsule.  Tr. at 363.  The Medical Center admitted

2

Badia on November 1, 2006, noting symptoms of pain on her right side, weakness, headache, slurring of speech, and unsteady gait.  Tr. at 384-86.  An MRI conducted on November 1, 2006 showed a hemorrhage in the right basal ganglion and also showed edema consistent with hypertension.  Tr. at 436.  On November 2, 2006, Dr. Atom Sakar visited Badia, and he recorded a past medical history of hypertension, bilateral carpal tunnel post surgery, hysterectomy, cholecystectomy, appendectomy, and lumbar laminectomy.  Tr. at 382-83.  He diagnosed Badia as suffering from a deep nuclear hemorrhage on the right side produced by hypertension.  Dr. Sakar opined that Badia would not need surgical intervention and that the best method to avoid future occurrences was aggressive management of her hypertension.

A CT scan conducted on November 15, 2006 revealed normal interval evolution of Badia's hemorrhage, no new acute intracranial hemorrhages, and stable ventricles with no significant midline shift.  Tr. at 361-62.  A CT scan on December 10, 2006 showed a "[r]esolving hematoma within the right basal ganglia without evidence of acute intracranial hemorrhage."  Tr. at 361.

Badia again reported to the Medical Center on January 23, 2007, complaining of a headache centered near her right eye, nausea, and dizziness.  Tr. 406-12.  Badia was oriented and alert; she denied weakness; and she did not exhibit facial droop or tongue deviation.  A CT scan of her head did not reach a significant finding.  Tr. at 361.  She was discharged with a diagnosis of "vertigo--nonspecific."  Tr. at 412.

Badia visited Dr. Andrew Slivka on January 30, 2007 for a follow-up examination.  Tr. at 373.  Dr. Slivka reported that Badia was doing well with no residual deficit and was back to her baseline.  He also reported that Badia had returned to work.  According

3

to Dr. Slivka, a follow-up CT scan had revealed a "resolving intracerebral hemorrhage," and the results of her neurological examination were "entirely within normal limits."  Tr. at 373.  He ascribed the previous week's vertigo and nausea to vestibular neuronitis, given Badia's history of hypertensive vascular disease.  Dr. Slivka recommended aggressive treatment of Badia's hypertension.

On October 8, 2007, Badia felt lightheaded and "cloudy," began sweating, and found herself unable to type because words no longer made sense.  Tr. at 340, 375.  She also experienced a recurrence of right-side headache accompanied by nausea and slurred and stuttering speech.  She was admitted to the Medical Center that day.  Tr. at 342-49.  Although Badia had a history of migraines, she denied that she was experiencing a migraine because her migraines had been on the left side and were not accompanied by other symptoms.  She was alert and oriented upon admission and had normal range of motion in her extremities and normal gait.  A CT scan found no evidence of acute intracranial hemorrhage and found unchanged abnormalities related to Badia's prior hemorrhage.  Tr. at 360.  An MRI found no evidence of ischemia and also found defects consistent with the prior hemorrhage.  Tr. at 365.  A Carotid Duplex Report found Badia's flow essentially normal, with less than 20% stenosis in her left, internal carotid artery.  Tr. at 423-24.  The Medical Center discharged Badia on October 9, 2007.

Badia visited Dr. Slivka for a follow-up on October 19, 2007.  Tr. at 375.  He reported that her neurologic examination revealed a slightly questionable asymmetry in her lower face and some minimal difficulty in the left upper and lower extremities but was otherwise unremarkable.  Dr. Slivka recommended aspirin and an antiplatelet

4

agent, and he noted that Badia was scheduled for the placement of a coronary stent in the following week.[1]

For a couple of weeks in March, Badia noticed that several times as she worked as a medical transcriptionist she found that she had typed portions of transcriptions backwards without any realization that she had done so.  Tr. at 289-90.  Then, on March 28, 2008, the police brought Badia to the emergency room at Riverside Methodist Hospital ("Riverside").  Tr. 289-315, 325-29.  Badia had driven to Burger King, ordered a meal, and, after receiving her food, began behaving oddly.  Badia walked out of the building, vomited, then began wandering aimlessly around the parking lot.  The police were called, and they brought Badia to the emergency room at Riverside.  Upon arrival at the emergency room, Badia was still confused and could not remember which medications she was currently taking or her complete medical history.  While waiting in the emergency room, however, Badia gradually returned to normal.  When interviewed by the attending physician, Badia remembered nothing between leaving her car at Burger King and sitting in the emergency room.  Badia did not experience any apparent seizure, loss of consciousness, or trauma.  Physical and mental examination found no significant abnormality.  Badia was admitted to the hospital and given a battery of tests, including an EEG, a CT scan, bloodwork, x-rays, an EKG, and MR angiographies. There were no significant results.  The attending physician, Kenneth Alan Mankowski, M.D., recorded the following impression:  "Transient spell of confusion, etiology unclear.

---

[1] Dr. Slivka also considered that Badia's event of October 8, 2007 might have been the result of a transient ischemic attack or a migraine, "although she does not have a history of migraine." Tr. at 375. The latter comment conflicts with the notes accompanying her admission to the Medical Center on November 1, 2006.

This would not be typical for a TIA or transient global amnesia . . . Certainly, a temporal lobe seizure remains a possibility, although I cannot make the diagnosis definitively." Tr. at 295.  He noted that the recent initiation of Chantix might have lowered Badia's seizure threshold.  Badia was discharged on March 31, 2008 without any satisfactory conclusion as to the cause of the episode.

On April 29, 2008, Badia reported to Dr. Slivka for a follow-up to her hospitalization.  Tr. at 377.  Badia told Dr. Slivka that for the past several months she had suffered right frontal headaches of varying severity and that when the headaches were most severe, they were accompanied by nausea.  According to Badia, the headaches occurred 3-4 times a week, and each lasted 6-12 hours.  Dr. Slivka observed a slight lower facial asymmetry and decreased pin and touch sensation distally in her legs.  Dr. Slivka tentatively diagnosed Badia as suffering from a complex partial seizure with secondary generalization and common migraine.  He scheduled Badia for an EEG and started her on Topamax.

Badia returned to the Medical Center emergency room on May 22, 2008, complaining of headaches, confusion, and nausea without vomiting.  Tr. at 333-38. Badia was alert, oriented, and coherent, had normal ranges of motion in her arms and legs, had no focal motor or sensory deficits, and exhibited no facial droop, weakness, or numbness.  A CT of Badia's head showed no sign significant changes since her November 1, 2006 CT scan.  Tr. at 359.

Badia visited Dr. Slivka again on June 18, 2008.  Tr. at 379.  He noted that Badia had "pretty much recovered" from her November 2006 cerebral hemorrhage.  Tr. at 379. He also observed that her headaches were less frequent while taking Topamax.

6

However, Dr. Slivka also noted that Badia complained of difficulty with numbers at work since her recent unexplained episode.  Dr. Slivka scheduled her for formal neuropsychological testing.

Badia again visited Dr. Slivka on August 27, 2008 and complained of headaches three to four times per week for the previous six weeks, each lasting three to four hours. Tr. 380.  She also reported continuing cognitive problems since her March 2008 episode.[2]  Examination again showed some sensory loss in her legs, and Dr. Slivka opined that this was probably due to Badia's diabetes.  He also noted abnormalities in spatial ability, visual attention, left hand dexterity, verbal concept formation fluency, learning, and memory, and he believed that these were related to the March 2008 event.

On November 17, 2008, Jennifer Badia ("Jennifer"), Badia's daughter, completed a Function Report Adult Third Party form.  Tr. at 208-15.  Jennifer reported that Badia had issues sleeping through the night, including migraines that affected her sleep. According to Jennifer, Badia fixed prepared meals a few times weekly; did cleaning, laundry, ironing, shopping, and dishes; but did not do any outside work.  Jennifer also reported that Badia had been restricted from driving through October and that although she was no longer under that restriction, it would be re-imposed if Badia had another seizure.  Badia's leisure activities included watching television when her migraines permitted and occasionally swimming.  Social events included interactions with family members but not many activities outside the house.  Jennifer wrote that Badia could pay

---

[2]  Dr. Slivka here and in later reports mistakenly refers to the event leading to Badia's March 28, 2008 hospitalization as occurring in April 2008.

bills but could not count change, handle a savings account, or use a checkbook or money orders because she has issues transposing numbers and counting, writing, and seeing backwards.  Jennifer also reported that Badia has difficulties with long- and short-term memory, concentration, and shortness of breath.

On February 4, 2009, Scott Donaldson, Ph.D., examined Badia at the request of the Bureau of Disability Determination "Bureau").  Tr. at 480-85.  Badia arrived at the appointment by automobile and was reserved but cooperative.  Dr.  Donaldson recorded a family history of hypertension and psychiatric disorders.  Badia reported surgical procedures on her gall bladder, an appendectomy, a hysterectomy, a Cesarean delivery, and carpal tunnel surgery.  She was currently prescribed Maxalt, enteric aspirin,  Vytorin, Cymbalta, Nortiptyline HCL, Metropolol tartrate, Lisinopril, and Topamax.  Badia reported that she had no problems getting along with others and that "[d]ue to her neurological status, she has not been able to return to full employment" as a medical transcriber.  Tr. at 481.

Dr. Donaldson found that Badia was dressed and groomed appropriately, ambulated independently, and understood the purpose of the examination.  Badia denied impulsiveness, compulsiveness, and activities that involved a high degree of painful consequences.  Flow of conversation and thought were normal.  Although Badia was somewhat anxious and uncomfortable at the start of the interview, she relaxed as it progressed.  Her affect was flat.  Badia reported difficulties sleeping, denied suicidal or homicidal ideation, and admitted occasional feelings of helplessness and worthlessness.  She also reported occasional mood swings, fatigue, lack of concentration, and decreases in libido but denied anhedonia.  She also denied anxiety,

8

experiences with panic, paranoid ideation, hallucinations, delusions, or obsessive thoughts.  Badia described her daily activities to Dr. Donaldson as follows:  "I drink coffee, call my children, get on the computer and check on my mom.  I cook, clean and launder my clothes.  I attend church services.  I have friends and I like to read.  I shop for groceries two to three times a week.  I drive and I leave home daily.  I live with my father."  Tr. at 482.

Dr. Donaldson found Badia to be alert and oriented to person, time, and place.  She recited seven digits forward and four digits backward, and memory appeared to be intact.  He administered the WAIS-IV intelligence test and concluded that Badia's ability to perform mental arithmetic was equal to the remainder of her cognitive abilities and that her intelligence fell within the "average" range.  Dr. Donaldson also administered the Wechsler Memory Scale-Revised and found no memory deficits.  He opined that her awareness of the world around her, judgment regarding decisions affecting her future, judgment regarding living arrangements, ability to cooperate in a treatment program, and ability to manage her own funds may be limited.  Dr. Donaldson diagnosed Badia as suffering from a dysthymic disorder and an anxiety disorder and assigned her a Global Assessment of Functioning ("GAF") of 50-55.[3]  He opined that she: could understand, remember, and carry-out one or two step job instructions; could handle repetitive tasks; had a moderate limitation in handling work stressors; and had mild

---

[3]  A GAF of between 51 and 60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).  A GAF between 41 and 50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).

limitations in interpersonal skills and attending to relevant stimuli.  He also opined that

Badia might need help in managing day-to-day funds and long-range financial affairs.

On February 16, 2009, John Waddell, M.D., reviewed Badia's file and completed

a Psychiatric Review Technique assessing Badia's condition.  Tr. at 486-99.  Dr.

Waddell found that Badia suffered from a dysthymic disorder and an anxiety-related

disorder.  He opined that she was mildly restricted in her activities of daily living, had

mild difficulties in maintaining social functioning, and had moderate difficulties in

maintaining concentration, persistence, and pace.

On March 15, 2009, Badia appeared at the Ohio Valley Medical Center

emergency room complaining of numbness.  Tr. at 603-05.  Badia was stressed

because of her son's arrest and woke up believing that both arms were numb, possibly

due to a stroke.  She told the attending physician, however, that she was not certain

whether her arms had actually been numb or if she had dreamed it.  She denied any

other complaints.  A physical examination, including a CT scan, revealed no

abnormalities.

On March 23, 2009, Teresita Cruz, M.D., reviewed Badia's file and completed a

Mental Residual Functional Capacity Assessment of her condition.  Tr. at 500-11.  Dr.

Teresita opined that Badia was moderately limited in her abilities to understand and

remember detailed instructions, carry out detailed instructions, maintain attention and

concentration for extended periods, complete a normal workday and workweek without

interruptions from psychologically-based symptoms and to perform at a consistent pace

without an unreasonable number and length of rest periods, and respond appropriately

to changes in the work setting.  Dr. Teresita also opined that Badia could occasionally

10

lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and was not limited in her ability to push or pull.  Dr. Teresita limited Badia to never climbing ladders, ropes, or scaffolds and only occasionally crouching.  Dr. Teresita concluded as follows:

> Clmt's allegations are partially credible.  She alleged continued weakness from brain stroke but with the intracranial bleed in 2007, there was no focal motor or neuro deficit, no evidence of weakness.  She also states she has had stents place [sic] but review of records from cardiology show mild diffuse disease except for the CX-OM1 which showed severe diffuse disease but no intervention. Medical tx recommended.  She is able to do all HH chores, is able to go shopping, riding in car and walking.

Tr. at 509.

Dr. David Stachel ("Stachel") treated Badia in July 2010 and March 2011.  Tr. at 623-27.  He noted that Badia was fully oriented, had no gross neurological deficits, was fully ambulatory, and had good memory  He recommended physical therapy.

*C.*    *Hearing testimony*

At the March 30, 2011 hearing, Badia testified that she smoked but did not drink alcohol or use illegal drugs.  Tr. at 39.  She asserted that she had gained weight since September 2008 and that this made exercise, walking, and other activities difficult.  Tr. at 39.  According to Badia, she had worked 20-23 years as a medical transcriptionist, was not presently working, and lived alone in an apartment.  Tr. at 39-41.  Badia testified that she had left her job voluntarily because she was getting negative feedback from her superiors resulting from her forgetting things that she used to be able to remember.  Tr. at 42.  She left on medical leave and had not tried to work since then. Tr. at 42.

Badia testified that the medications she was taking did not control her conditions

11

and that she was no longer taking pain medication because it did nothing for her.  Tr. at 45-46.  She asserted that in an eight hour period she sits for three or four hours total in increments and must lie down about two hours in an eight hour period.  Tr. at 46-47.  Badia also said that she was unable to go through an eight-hour period without lying down.  According to Badia, the fingers of her left hand are numb and cannot grip, and the fingers of her right hand are a little better.  Tr. at 47.  Badia testified that she was able to lift her arms above her head but that she could only lift a half gallon on milk with her right hand and less with her left.  Tr. at 47-48.  She was able to care for herself and dress herself, sit for above 45 minutes before changing posture, walk for about a block before she risks falling, and climb stairs with a handrail.  Tr. at 49, 51.  She was unable to climb ladders, due to dizziness.  Tr. at 49.  Badia had a valid driver's license, drove about once a week, and was able to drive for about an hour at a time.  Tr. at 49-50.  She was able to do household chores, including vacuuming and cleaning.  Tr. at 53.  She had not participated in physical therapy at the orders of a physician.  Tr. at 49.

Badia testified that she goes to bed about 3:00 or 4:00 a.m. and wakes about noon, getting four or five hours sleep in that time.  Tr. at 50-51.  She stated that she had been treated for depression and anxiety and was subject to crying spells, but she denied being unable to control her emotions.  Tr. at 51-52.  Her biggest mental problems were memory, especially numerical memory, and attention.  Tr. at 52-53.

Badia stated that she visited family or friends about once a week but did not go out to dinner or to the movies.  Tr. at 54.  She said she was unable to work at the soup kitchen or private homes feeding people or helping them dress, as she used to do.  Tr. at 53-54.  When she shops, usually her son or daughter accompanies her and helps.

Tr. at 54, 55.

The ALJ asked the VE to assume an individual of Badia's age and with her education and experience; restricted to light and sedentary work; capable of carrying ten pounds occasionally; able to stand and walk six hours in an eight-hour day; with no postural limitations except an inability to climb ladders, ramps, and scaffolds; able to occasionally reach overhead; required to avoid concentrated exposure to work hazards, such as moving machinery; limited to simple detailed tasks but not complex tasks; and able to sustain superficial interaction with others.  When asked if such an individual could perform Badia's past work or any other work, the VE replied that such an individual could perform Badia's past relevant work as a medical transcriptionist and could also perform such other jobs as data entry clerk, work processor and typist, sales attendant, and cashier.  Tr. at 58-59.  When the ALJ added a sit-stand option with alternating sitting and standing and not doing either for more than four hours in an eight-hour workday, the VE opined that the individual would be able to perform Badia's past relevant work and some cashier jobs.  Tr. at 59-60.  When the VE added other restrictions, including a need to lie down for two out of eight hours, the VE said that the latter restriction alone would not allow the individual to perform work in the national economy.  Tr. at 62-63.  Upon examination by Badia's attorney, the VE opined that assuming the individual first hypothesized by the ALJ, if such an individual would have two unexcused absences every month, there would be no work for such an individual. Tr. at 63-64.

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes

disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second,  the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

14

## IV.  Summary of Commissioner's Decision

In determining that Badia was not disabled, the ALJ made the following relevant

findings:

> 1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

> 2.  The claimant has not engaged in substantial gainful activity since September 10, 2008, the alleged onset date.

> 3.  The claimant has the following severe impairments: obesity, obstructive sleep apnea; hypertension; a history of intracranial bleed and cerebral vascular accident; diabetes mellitus with lower extremity neuropathy; migraine headaches; diffuse coronary artery disease; a dysthymic disorder and anxiety disorder.

> 4.  The claimant does not have an impairment or combination or impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

> 5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(a) except that she can lift and/or carry ten pounds occasionally; can stand and/or walk six hours in an eight-hour workday; can sit for six hours in an eight hour workday.  She can occasionally balance, crouch, crawl, kneel, stoop and climb ramps and stairs, but should never climb ladders, ropes or scaffolds.  The claimant can occasionally reach overhead, and should avoid concentrated exposure to work hazards such as unprotected heights and moving machinery.  She can perform simple and detailed tasks, but no complex tasks.  The claimant can have superficial interactions with others.

> 6.  The claimant is capable of performing her past relevant work as a Medical Transcriber.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

> 7.  The claimant has not been under a disability as defined in the Social Security Act, from September 10, 2008, through the date of this decision.

Tr. at 13-24 (citations omitted).

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence

15

in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

Badia alleges that the ALJ erred because (1) the ALJ did not properly consider Badia's subjective statements and (2) the ALJ failed to call a medical expert at the hearing.  The Commissioner denies that the ALJ erred.

*A.     Whether the ALJ properly considered Badia's statements*

Badia alleges difficulties with memory, including an inability to remember numbers and transposing them and forgetting certain events.  She also alleges that her attention span was impaired.  According to Badia, her 2006 hemorrhage, her occasionally erratic behavior, and her continued treatment for headache and confusion require the ALJ to credit completely Badia's allegations regarding her subjective symptoms, rather than only partially crediting them.  The Commissioner responds the the ALJ properly considered the entire record before determining the weight that should be given Badia's statements and that the decision to credit them in part is substantially

16

justified by the record.

The Sixth Circuit in *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994), most clearly stated the test which courts must use in reviewing the Commissioner's determinations of the credibility of an applicant's statements about pain and other subjective symptoms. The court reviewed the pertinent regulations at 20 C.F.R. § 404.1529 and summarized the applicable test as follows:

> First, we examine whether there is objective medical evidence of an underlying medical condition.  If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged [symptoms] arising from the condition;  or (2)  whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling [symptoms].

*Id.* at 1038-39 (quoting *Duncan v. Secretary of Health and Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986)).  The court also summarized the factors that should be considered in determining whether the established medical condition is of such a severity that it can reasonably be expected to produced the alleged disabling symptoms:

> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms .
> . . .

*Felisky*, 35 F.3d at 1039-40.  The Court added that "the opinions and statements of the claimant's doctors" are also relevant to the Commissioner's and the reviewing court's determination.  *Id.* at 1040.

In the present case, the ALJ determined that Badia's medically determinable

impairments could reasonably be expected to cause her alleged symptoms. Tr. at 16-17. The ALJ determined, however, that a review of the record did not support the alleged severity of Badia's symptoms. In reaching the latter conclusion, the ALJ cited the following evidence in the record:

1.      CT and MRI scans of Badia's head immediately after her hemorrhage and in the years afterward showed that her condition was resolving within a few months of the event and that the site of the event remained stable over time. Moreover, later scans detected no signs of ischemia.

2.      When Badia complained of headache and dizziness in January 2007, the CT showed no significant findings, there was no evidence of facial droop of tongue deviation, and grasp was firm.

3.      Dr. Slivka, Badia's primary treating physician for her hemorrhage, reported in January 2007 that Badia had been doing well, had no residual deficit from the event, was back at her baseline, and had returned to work.

4.      During Badia's emergency room visit in October 2007 for headache and dizziness, a CT scan, an MRI, and a Carotid Duplex Report failed to show any condition supporting an additional cardiovascular event, and Dr. Slivka attributed Badia's symptoms to a possible migraine.

5.      When Badia alleged disorientation and memory loss during the March 2008 event, no seizure was witnessed, an EEG was normal, a CT scan was unremarkable, an MRI showed no sign of an acute infarct, and MR angiography of the brain and neck showed no evidence of stenosis. Dr. Slivka suggested that the symptoms were due to a partial seizure or migraine.

18

6.      A CT scan of Badia's head in May 2008 when she reported headache and nausea showed no evidence of acute intracranial hemorrhage.  A month later, Dr. Slivka noted that Badia had pretty much recovered from her hemorrhage.

7.      When Badia reported possible numbness in March 2009, a CT scan revealed no significant findings.  Badia admitted that she may have dreamed the symptoms.

8.      The evidence suggests Badia experienced a full recovery from her 2006 intracranial bleed.  The evidence also shows that she experiences migraines infrequently and retains significant abilities even when she goes to the hospital.

9.      Dr. Stachel indicated that Badia had no neurological deficits and was fully ambulatory.  He also recommended that Badia undergo physical therapy.  The ALJ concluded that Badia's failure to undergo physical therapy indicated that her symptoms were not as severe as alleged.

10.     There is no indication in the record that Badia sought psychiatric treatment for her mental problems.  This indicates that her problems are not as severe as alleged.

11.     Dr. Donaldson found that Badia exhibited no signs of confusion or lack of awareness, recited seven digits forward and four backward, exhibited intact memory for past and recent events, her performance on the WAIS-IV indicated average intelligence, and her performance on the Weschler Memory Scale did not indicate a deficit with memory.

In addition, the ALJ reviewed Badia's medications and their side effects, her return to work after her 2006 hemorrhage, her activities of daily living, and other medical opinions

19

in the record regarding Badia's functional capacity.

After reviewing the evidence in the record, The ALJ summarized his conclusions

as follows:

> In total, the objective medical evidence does not support the claimant's allegations of debilitating symptoms.  While she clearly suffered an intracranial bleed in October of 2006, the evidence suggests that she experienced a full recovery.  Objective studies have generally been negative on that point. . . . In sum, the evidence does not support limitations beyond those outlined in the above referenced residual functional capacity.

Tr. at 18.  The evidence cited by the ALJ constitutes substantial evidence in support of

this opinion.  Badia's arguments to the contrary are not well-taken.

*A.  Whether the ALJ erred by failing to call a medical expert at the hearing*

Badia argues that the ALJ erred by relying on Dr. Donaldson's impression of

Badia's cognitive limitations rather than calling on a medical expert at the hearing.

According to Badia, because her symptoms come and go, a one-time "snapshot" of her

mental condition, such as Dr. Donaldson's, is insufficient properly to assess that

condition.  Rather, Badia asserts, the ALJ should have asked a medical expert to testify

to obtain a longitudinal assessment of Badia's condition.  The Commissioner denies that

the ALJ was required to ask a medical expert to testify at the hearing.

The ALJ must determine when a medical expert is necessary.  *See* 20 C.F.R. §§

404.1527(e)(2)(iii), 416.927(e)(2)(iii).  The failure to call a medical expert, by itself, does

not prevent a court from finding that substantial evidence supports an ALJ's decision.

*Davis v. Chater*, 1996 WL 732298, at *3 (6th Cir. 1996).

Badia assumes that the ALJ relied only on Dr. Donaldson's conclusions in

discrediting her statements about her subjective symptoms.  If Dr. Donaldson's

conclusions were the only evidence that the ALJ relied on in concluding that Badia's allegations regarding her symptoms were only partially credible, Badia's argument would have some merit.  But, as described above, the ALJ relied on the record as a whole in determining that Badia's statements were only partially credible.  Moreover, the ALJ specifically cited multiple opinions of Dr. Slivka, Badia's treating physician, that the 2006 hemorrhage had resolved itself and that she had returned to her normal baseline.  For these reasons, despite the ALJ's decision not to call a medical expert, the ALJ's decision is supported by substantial evidence.

VII.  Conclusion

For the reasons given above, the decision of the Commissioner is AFFIRMED.


Date:  February 7, 2013                    s/ *Nancy A. Vecchiarelli*
                                          Nancy A. Vecchiarelli
                                          U.S. Magistrate Judge

21